UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONYA RECHARDIA ROSS,

       Plaintiff,

v.                                Civil Action No. 14-11144
                                     Honorable Linda V. Parker

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 12] AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 15]

Plaintiff Tonya Rechardia Ross ("Ross") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [ECF Nos. 12, 15]. For the reasons set forth below, the Court denies Ross' motion and grants the Commissioner's motion.

## I.      Procedural History

On September 12, 2011, Ross filed applications for DIB and SSI, alleging a disability onset date of July 25, 2011 due to diabetes, high blood pressure, problems with her right ankle, and depression.  (Tr. 76, 96-97, 202.)  After these applications were denied initially, Ross filed a timely request for an administrative hearing, which was held before Administrative Law Judge Beth J. Contorer ("ALJ") on October 2, 2012.  (Tr. 39-74.)  Ross, who was represented by an attorney, testified at the hearing, as did vocational expert Erin M. O'Callaghan ("VE").  (*Id.*)  On October 19, 2012, the ALJ issued a written decision finding Ross not disabled.  (Tr. 34.)  In January 2014, the Appeals Council denied review. (Tr. 1-3.)  Ross timely filed for judicial review of the final decision on March 18, 2014.  (ECF No. 1.)

## II.      Background

### A.      Ross' Disability Reports and Testimony

At the time of the October 2, 2012 administrative hearing, Ross was 46 years old.  (Tr. 43).  She was five feet tall and weighed approximately 255 pounds.  (*Id.*) She graduated from high school and had attended college, but had not graduated with a degree.  (*Id.*)

In fact, Ross returned to school in April 2012, taking one class at a time at the University of Phoenix.  (Tr. at 44.)  At the time of the hearing, she was taking

2

her fifth class since returning to school.  (*Id*.)  The class met once a week from 8:30 a.m. until 12:30 p.m.  (*Id*.)  Ross testified that she earned two A minuses, a B minus, a B, and a C in her classes and received no special accommodations.  (Tr. at 45.)

Ross lived in a house with her son, who was nineteen years old at the time of the hearing. (Tr. 45, 216.)  On a function report completed on September 30, 2011, Ross stated that she had no problems with her personal care.  (Tr. at 217.)  She also stated that she prepared her own meals every other day.  (Tr. 218.)  She reported doing household chores, such as washing dishes, cleaning the bathroom, and mopping the bathroom and kitchen.  (*Id*.)  She stated that she could drive a car, and in fact drove herself to the October 2, 2012 hearing.  (Tr. 43, 219.)  Ross also stated that she shops in stores and on the computer for groceries and personal care items.  (Tr. 219.)

On the function report, Ross indicated that she reads, watches television, and talks with friends and family on the phone daily.  (Tr. 220.)  She testified that she also likes to play games on the computer, like Solitaire, which she can do for about an hour at a time.  (Tr. 54, 67.)  Ross testified that she can sit for a couple of hours at one time and then her feet start to swell.  (Tr. 61.)  She provided that her most comfortable position during the day is sitting on her bed with her right leg elevated and that she does this for about five hours a day.  (Tr. 58-59.)  Ross also testified

that she can walk for a block with her cane and a half block without her cane, and that she can stand for approximately thirty minutes with the assistance of her cane. (Tr. 60-61.)  She testified that she uses her cane every day.  (Tr. 58.)  Ross claimed that she cannot lift or carry more than ten pounds due to a hernia.  (Tr. 61.)

On the function report Ross completed in September 2011, she reported that she was able to pay attention for about an hour, finishes what she starts, and follows written and spoken instructions but sometimes forgets a portion of the instructions.  (Tr. 221.)  At the hearing before the ALJ, however, Ross stated that she has some problems with her memory and ability to concentrate.  (TR. 61.)  When asked to elaborate, Ross explained how she sometimes forgets to take her medications unless her son reminds her.  (Tr. 62.)  She reported getting along with authority figures and that she had never been fired or laid off from a job because of a problem getting along with other people.  (Tr. 222.)

Prior to the onset date of her disability, Ross worked as a claims processor, clerical worker at a real estate business, and a grocery store cashier.  (Tr. 48-50.)  Ross last worked in a temporary position through Kelly Services.  She testified at the hearing before the ALJ that she stopped working at Kelly Services because she thought they lost their contract.  (Tr. 51.)  She also testified that she is not able to work a full-time job due to problems with her right ankle which she previously broke in a fall from a ladder, pain in multiple sites caused by fibromyalgia,

4

diabetes which causes her to feel dizzy or upsets her stomach about once a week, and depression.  (Tr. 53-55.)  Ross indicated that she also has problems with her left ankle, which swells up every now and then.  (Tr. 54.)  Ross testified that she experienced sadness, crying spells and moodiness, which lately had occurred about every other day because she was looking for work which had "been hard."  (Tr. 55.)

### B.    Medical Evidence

On April 9, 2008, Ross went to Henry Ford Health System complaining of a right ankle injury resulting from a fall from a step-ladder at home.  (Tr. 244, 251.) She was diagnosed with a right bimalleolar ankle fracture, for which she underwent open reduction and internal fixation.  (Tr. 319-20.)  She was discharged on April 11, 2008, with instructions to follow up with Dr. Brian Rill.

At an appointment with Dr. Rill five weeks after her surgery, Ross reported no ankle pain and x-rays showed satisfactory alignment and healing.  (Tr. 406.) Subsequent to the resumption of weight bearing activities, at an August 27, 2008 appointment with Dr. Rill, Ross continued to report no ankle pain, she had a good range of motion, and x-rays showed very good interval healing.  (Tr. 404.)

Records from a visit with Dr. Rill on September 19, 2008, however, reflect that Ross was complaining of pain and swelling in the right ankle.  (Tr. 403.)  She continued to complain of pain at appointments in February and April 2009.  (Tr.

5

401-02.)  At the appointment on April 3, 2009, Ross described the pain as persistently at about a 4/10, worsening with prolonged walking and standing.  (Tr. 401.)  The doctor's report reflects that Ross was not taking any medications for the pain.  (*Id*.)  Dr. Rill reports that he believed Ross "just has chronic pain at this point, likely persistent."  (*Id*.)  At her next appointment on July 10, 2009, Ross reported that her pain had decreased to 2/10 since her last appointment.  (Tr. 400.)  Dr. Rill noted that the incisions for the surgery were well healed and Ross had good range of movement.  (*Id*.)  Ross had begun taking Meloxicam, an anti-inflammatory, which had reduced her pain but was casing some itching symptoms as a side effect.  (*Id*.)  Dr. Rill switched Ross' medication to Etodolac and instructed her to make an appointment with Dr. Needleman if her pain symptoms persisted and with Dr. Rill as needed.  (*Id*.)

On February 24, 2010, Ross went to Michigan Physicians Group complaining of cold symptoms.  (Tr. 435-36.)  She reported having a cough and some congestion.  (*Id*.)  It was noted that Ross was a smoker and smoked a half pack a day.  (*Id*.)  Hypertension and diabetes were noted, although her hypertension was reported to be stable.  (*Id*.) Ross was diagnosed with bronchitis, with instructions to follow up with her doctor.

On November 10, 2011, Ross' treating physician at Michigan Physicians Group, Rita Shah, M.D., completed a medical exam report on Ross.  (Tr. 464-65.)

6

Dr. Shah noted that Ross had chronic pain at multiple locations, including her ankles, hips, back, and thoracic wall. (Tr. 464.) Dr. Shah diagnosed Ross with chronic pain syndrome, fibromyalgia, diabetes, hypertension, obesity, and depression. (*Id*.) She found Ross oriented to time, place and person, but indicated that Ross appeared anxious and was crying. (Tr. 465.) She found Ross to be stable and capable of meeting her needs in the home. (*Id*.) Ross testified before the ALJ that she had asked Dr. Shah to fill out a form for Ross to obtain a handicap parking permit, but Dr. Shah would not fill it out. (Tr. 58.)

On November 17, 2011, Ross underwent a consultative examination with an internist, Bina Shaw, M.D. (Tr. 466-68.) Ross stated that she had a history of hypertension, diabetes, and chronic pain in the right heel and right ankle region. (Tr. 466.) It also was noted that Ross had been diagnosed with depression and fibromyalgia and had been hypertensive and diabetic for five years. (*Id*.) Ross informed Dr. Shaw that she did not check her blood sugar levels because she could not afford the strips. (*Id*.) Ross reported a history of a tear of the tendo-Achilles in 1998 requiring repair and a right ankle fracture requiring surgery. Dr. Shaw indicated that Ross was able to walk without a cane and that no major limp was noticed. (*Id*.) Ross reported mild lower back pain and constant pain between the shoulder blades which worsens at nighttime. (*Id*.)

7

On physical exam, Dr. Shaw noted that Ross was alert and oriented to time, place, and person.  (Tr. 467.)  She had full range of motion in her neck and in her cervical spine, but her range of motion in her thoracolumbar spine with forward flexion was from 0-60 degrees.  (*Id*.)  Ross had full range of motion in her hips, knees, and ankles bilaterally.  (Tr. 468.)  She had full range of motion in her shoulders, elbows, and wrists.  (*Id*.)  Ross' gait was steady and she was able to get off the examination table and out of a chair without assistance.  (*Id*.)  Dr. Shaw diagnosed Ross with obesity, hypertension, type II diabetes, possible fibromyalgia, upper and lower back pain possibly from fibromyalgia, right ankle pain after surgery for right ankle fracture, and left tendo-Achilles repair with mild residual pain.  (*Id*.)  Dr. Shaw opined that Ross could work eight hours a day, sit, stand, and walk, bend minimally, and "lift at least ten pounds of weight without difficulty."  (*Id*.)

On November 17, 2011, Ross also underwent a consultative examination with Basivi Baddigam, M.D., a non-treating, board certified psychiatrist.  (Tr. 475-77.)  Ross reported that she was depressed and had felt depressed on and off for the past two years.  (Tr. 475.)  She could not identify a specific event that triggered her depression.  (*Id*.)  Ross informed Dr. Baddigam that she stays home and does not go out much, that she cannot focus or concentrate well, had no energy, and did not socialize much with others.  (*Id*.)  She indicated that she had never been treated in

8

a psychiatric hospital. (*Id.*) Ross reported that her activities included watching television, doing chores, and cooking. (Tr. 476.)

Dr. Baddigam noted his observations that Ross was moderately obese, her hygiene and grooming were fair, her gait was normal, she sat in the chair comfortably, and did not show any unusual or bizarre behavior. (Tr. 476.) He found Ross to be in touch with reality, with low self-esteem. (*Id.*) Her speech was noted to be clear, coherent, and goal directed, and her thought processes were well organized and easy to follow. (*Id.*) She was cooperative during the examination; her affect was appropriate to thought content and her mood was calm. (*Id.*) Ross was able to repeat four of four digits forwards and backwards, was able to recall two of three objects after three minutes, and was able to perform simple math calculations. (*Id.*)

Dr. Baddigam diagnosed Ross with a dysthymic disorder and assessed her a GAF score of 55. (Tr. 477.) He also noted that Ross got along fairly well with others, was not aggressive or assaultive, and was able to understand, remember, and follow through with directions. (*Id.*)

James Tripp, Ed.D, a non-treating, non-examining physician, completed a psychiatric review technique on Ross on December 21, 2011. (Tr. 76-81.) The ALJ, however, gave his opinion little weight, finding that evidence from Ross' treating mental health providers supported a severe mental health impairment

9

whereas Dr. Tripp found her mental impairment not severe.  (Tr. 31-32.)  As the ALJ assessed the opinion little weight and Ross does not complain about the treatment of this opinion in her summary judgment motion, the Court finds it unnecessary to elaborate on Dr. Tripp's findings here.

The ALJ, however, gave great weight to the opinion of Muhammad Mian, M.D., a non-treating, non-examining physician who completed a residual functional capacity assessment of Ross on December 27, 2011.  (Tr. 32.)  After reviewing the medical evidence of record, Dr. Mian opined that Ross could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and sit for a total of six hours in an eight hour workday with normal breaks.  (Tr. 82.)  He further opined that Ross could frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds, occasionally balance, stoop, and crawl, and frequently kneel and crouch.  (Tr. 82-83.)

On January 4, 2012, x-rays were taken of Ross' feet.  (Tr. 589.)  The results showed degenerative changes at the tibiotalar joint with a subchondral cyst formation on the right foot.  (*Id*.)  There appeared to be disuse osteopenia within the right foot.  (*Id*.)  Left foot x-rays showed a questionable avulsion fracture of the distal tibia.  (*Id*.)

On February 20, 2012, x-rays were taken of Ross' lumbar spine.  (Tr. 596.)  The results showed her lower thoracic spine had at least two levels of osteophyte

formation.  (*Id.*)  The vertebral body heights and disc spaces were maintained.
(*Id.*)  The overall impression was "[l]umbar spine grossly negative."  (*Id.*)  At an
appointment on March 26, 2012, Ross described her upper back pain as feeling like
she had "been hit by a truck."  (Tr. 487.)  She described the pain similarly at an
appointment on April 2, 2012.  (Tr. 484.)

On March 28, 2012, Ross underwent a psycho-social assessment at Team
Mental Health Services.  (Tr. 616.)  The assessment notes reflect that Ross was
referred to the agency by her lawyer.  (*Id.*)  Ross reported feelings of depression,
fatigue, constant pain, low libido, and racing thoughts.  (*Id.*)  She was feeling
financial pressure.  (*Id.*)  Ross stated that she had a psychiatric problem in 2000,
and had gone to Michigan Rehabilitation Services and was diagnosed with bipolar
disorder.  (*Id.*)  She reported that her problems started approximately twelve years
earlier, but had recently worsened due to health problems and financial difficulties.
(*Id.*)

The assessment reflects that Ross was pleasant, cooperative, and dressed
appropriately.  She was oriented to person, place, and time, had fair insight, intact
judgment, normal recall, average intellectual functioning, and coherent thought
process.  (*Id.*)  Ross reported that she enjoyed watching television, being with her
grandbaby, and having sit down dinners with her children and her mom.  (Tr. 617.)
She stated that she did not need any assistive devices or other accommodations.

11

(*Id*.)  She reported leg pain and that her fibromyalgia was acting up.  (*Id*.)  Ross requested resources for finding work and housing.  (Tr. 620.)  Ross was diagnosed with bipolar disorder and assessed a Global Assessment Functioning ("GAF") score of 45.  (*Id*.)  Her treatment plan included psychiatric evaluation, monthly therapy, and link with case management.  (Tr. 621.)

On April 20, 2012, Ross had an initial psychiatric evaluation completed at Team Mental Health Services.  (Tr. 648-49.)  She reported a significant increase in depressive symptoms in the past year due to multiple deaths in her family and health problems.  (Tr. 648.)  She indicated that she had not been able to work due to pain and health problems.  (*Id*.)  Ross stated that she had lost her job and apartment four months earlier and became suicidal and was hospitalized.  (*Id*.)  When asked about this at the hearing before the ALJ, however, Ross denied any history of psychiatric hospitalizations and indicated that she had no knowledge of ever making such a statement.  (Tr. 60.)

During the initial psychiatric evaluation, Ross indicated that she had been prescribed Zoloft, which she had taken until she ran out two months earlier.  (Tr. 648.)  With respect to Ross' mental status, it was noted in summary that she demonstrated good grooming, timeliness, orientation, sadness, calm behavior with social smile, logical and coherent thought process, intact judgment, good eye contact, normal speech, no evident psychosis, no delusional, obsessive or

compulsive thought, average intelligence, and fair insight. (Tr. 649.) She was diagnosed with depressive disorder and assessed a GAF score of 50. (*Id*.) It was determined that she was faced with overwhelming life issues resulting in depression. Ross did not want medication; psychotherapy was highly recommended to develop coping strategies and management. (*Id*.)

At an appointment at Team Mental Health Services on May 18, 2012, Ross reported that she has been upbeat lately, is goal oriented, going to school, and working for a friend. (Tr. 646.) She also was working on quitting smoking. (*Id*.) At an appointment on July 13, 2012, Ross complained of poor sleep and was prescribed Benadryl. (Tr. 645.)

Staff at Team Mental Health Services completed a medical source statement for Ross on September 26, 2012. (Tr. 797-801.) Ross was reported to have moderate limitations in the following: the ability to remember locations and work-like procedures; to understand and remember detailed instructions; to maintain attention and concentration for extended periods (defined as the approximate two hour segments between arrival and first break, first break and lunch, lunch and second break, and second break until departure); and to complete a normal workday and workweek without interruptions from her psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 797-98.) It also reflects moderate limitations in Ross'

ability to respond appropriately to changes in the work setting, to travel to unfamiliar places and use public transportation, and to set realistic goals or make plans independently of others.  (Tr. 800.)

According to records from her physician's office, as of January 4, 2012, Ross had been prescribed Aspirin, Calcium, Fish Oil, Flexeril (a muscle relaxant), Glucophage for her diabetes, Glucose Test Strip, Metoprolol Tartrate for her hypertension, Vitamin D, and Tramadol (a narcotic-like pain reliever).  (Tr. 479, 56.)  Ross testified before the ALJ that at her last Team Mental Health Services visit approximately two weeks earlier, she also had been prescribed Trazodone to treat her depression and Buspirone for anxiety.  (Tr. 57.)  Ross further testified that since starting these medications, she had been sleeping better and "not crying all day."  (*Id*.)

### C.  Vocational Expert's Testimony

During her testimony, the VE characterized Ross' past relevant work as a customer service representative, clerk, and claims processor as sedentary and skilled, sedentary and semi-skilled, and light and skilled, respectively.  (Tr. 68.)  The ALJ asked the VE to imagine a claimant of Ross' age, education, and work experience, who could perform a full range of light work with the following additional limitations: occasionally engage in postural activities except should never climb ladders; can occasionally operate foot pedals; can occasionally reach;

14

and should avoid concentrated or excessive exposure to respiratory irritants and humidity.  (Tr. 68-69).  The VE testified that the hypothetical individual could perform Ross' past relevant work.  (Tr. 69.)  The ALJ then asked if the same person could perform Ross' past relevant work if he or she could sit for no more than two hours at a time and stand for no more than ten to fifteen minutes at a time. (*Id.*)  The VE answered that the individual could perform Ross' past relevant work as a clerk and customer service representative, but not as a claims adjustor.  (*Id.*) The VE also provided that the individual could perform a variety of light, unskilled work in southeastern Michigan.  (Tr. 70.)

The ALJ then asked if jobs were available in the national economy if the individual also was limited to simple, unskilled work with no more than occasional interaction with the general public and co-workers.  (*Id.*)  The VE responded that jobs would be available.  (*Id.*)  She also provided that a significant number of jobs would be available if the individual were further limited to sedentary work, providing as examples a sorter or bench assembly person.  (*Id.*)  The ALJ then asked if any of the jobs could be performed by the same person, if the person also had to elevate his or her feet to waist height.  (Tr. 70-71.)  The VE testified that this additional restriction would be work preclusive.  (Tr. 71.)

Ross' attorney then asked the VE what amount of time an individual could be off task due to pain or difficulty concentrating, to which the VE replied that the

15

individual would need to be on task a minimum of eighty percent of the work day.

(Tr. 71.)  The VE also provided in response to questions by Ross' attorney that an

individual missing more than one to two days of work each month due to

symptoms of depression or pain symptoms would not be able to sustain

competitive work.  (Tr. 72.)

## III.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a

"disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act

defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason
> of any medically determinable physical or mental impairment
> which can be expected to result in death or which has lasted or
> can be expected to last for a continuous period of not less than
> 12 months.

42 U.S.C. § 1382c(a)(3)(A).  An ALJ considering a disability claim is required to

follow a five-step process to evaluate the claim.  20 C.F.R. § 404.1520(a)(4).

The ALJ's five-step sequential process is as follows:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . .
> physical or mental ability to do basic work activities," benefits
> are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  If the ALJ determines that the claimant is disabled or not disabled at a step, the ALJ need not proceed further.  20 C.F.R. § 404.1520(a)(4).  However, if the ALJ does not find that the claimant is disabled or not disabled at a step, the ALJ must proceed to the next step.  *Id*.  "The burden of proof is on the claimant through the first four steps . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 n.5 (1987).

**IV.    The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found Ross not disabled under the Act.  At Step One, the ALJ found that Ross has not engaged in substantial gainful activity since July 25, 2011, the alleged onset date.  (Tr. 23).  At Step Two, the ALJ found that Ross has the following severe impairments: degenerative joint disease of the right foot, status post bimalleolar ankle fracture and repair, hypertension, diabetes, diabetic neuropathy, obesity, and depressive disorder.  (*Id*.)  At Step Three, the ALJ found that Ross's impairments do not meet or medically equal a listed impairment.  (Tr. 24-26.)

The ALJ then assessed Ross's residual functional capacity ("RFC"), concluding that she is capable of performing a reduced range of light work in that she can: lift and/or carry up to twenty pounds occasionally, and up to ten pounds frequently; sit for six of eight, and stand and/or walk for six of eight hours of a workday, as long as she does not sit more than two hours at a time or stand for more than ten to fifteen minutes at a time; occasionally stoop, balance, kneel, crouch, and crawl; occasionally climb stairs; never climb ladders; and occasionally reach and use foot pedals; avoid concentrated or excessive exposure to respiratory irritants, such as dust, odors, and fumes; and avoid humidity.  (Tr. 26-27.)  The ALJ also limited Ross to simple, unskilled work.  (Tr. 27.)

18

At Step Four, the ALJ determined that Ross is unable to perform her past relevant work as a claims processor, clerk, or customer service representative.  (Tr. 33.)  At Step Five, based in part on the VE's testimony, the ALJ concluded that Ross is capable of performing other work existing in the national economy.  (Tr. 33-34.)  As a result, the ALJ concluded that Ross is not disabled under the Act. (Tr. 34.)

## V.   Standard of Review

The district courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec'y*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec'y*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Rogers v. Comm'r of Soc. Sec'y*, 486 F.3d 234, 241 (6th Cir. 2007) (internal

quotations omitted).

In deciding whether substantial evidence supports the ALJ's decision, the

court does "not try the case de novo, resolve conflicts in evidence or decide

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);

*Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court,

to evaluate the credibility of witnesses, including that of the claimant.").  Further,

when reviewing the Commissioner's factual findings, the court is limited to an

examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir.

1992).  The court "may look to any evidence in the record, regardless of whether it

has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d

at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir.

1989).  There is no requirement, however, that either the ALJ or the court discuss

every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of*

*Soc. Sec'y*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all

evidence without directly addressing in his written decision every piece of

evidence submitted by a party.") (internal quotations omitted).  If the

Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if

20

substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

## VI.    Analysis

Ross argues that the ALJ failed to give appropriate consideration, or any consideration at all, to the opinion of her treating physician, Dr. Rita Shah, and that the ALJ's decision is not support by substantial evidence.  As to the latter argument, Ross contends that the ALJ erred by: (1) failing to address certain diagnosed conditions, including fibromyalgia; (2) giving "great weight" to Dr. Bina Shaw's and Muhammad Mian's opinions, but not assessing a RFC consistent with those opinions; and (3) discounting Ross' credibility "for reasons that do not hold up to further scrutiny."  (ECF No. 12 at Pg ID 869.)  Each of these arguments will be addressed in turn.

### A.    The Weight Given to Dr. Shah's "Opinion"

Ross contends that the ALJ did not sufficiently consider Dr. Shah's "opinion", explain the weight being afforded the doctor's opinion, or explain why she was not giving that opinion great weight.  Specifically, Ross points to the ALJ's alleged failure to discuss Dr. Shah's diagnosis of fibromyalgia and chronic pain at multiple locations, which Ross contends would have provided objective evidence supporting her complaints of back pain.

21

The "treating source" rule set forth in 20 C.F.R. § 404.1527 provides that an ALJ must give the opinion of a treating source controlling weight if the ALJ finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Id*. § 404.1527(c)(2). If the ALJ does not afford the opinion of a treating source controlling weight, the ALJ's "decision denying benefits 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' " *Wilson v. Comm'r of Soc. Sec'y*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996)). The regulations define "medical opinions" as:

> statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

As the Commissioner points out, Dr. Shah listed some diagnoses and made some medical findings in her report concerning Ross, but those findings did not include a judgment "about the nature and severity of [Ross'] impairments, what

22

Ross "can still do despite [her] impairments", or her "physical or mental restrictions." *Id*. Even if Dr. Shah provided a medical opinion, as defined by the regulations, Ross fails to show that the ALJ erred in her consideration of it.

The only "opinion" of Dr. Shah that Ross claims was not properly considered by the ALJ is the doctor's diagnosis that Ross suffers from fibromyalgia and chronic pain syndrome. The ALJ considered Ross' fibromyalgia and chronic pain in her Step Four RFC assessment, however. (Tr. 29.) Sixth Circuit precedent establishes that the ALJ's failure to consider these conditions at Step Two is not reversible error as she found other severe impairments and therefore continued with the five-step evaluation. *See, e.g., Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (finding no reversible error where the ALJ found some severe impairments, thereby enabling the claimant to "clear step two of the analysis," and then considered all of the claimant's impairments in the remainder of his analysis); *Fisk v. Astrue*, 253 F. App'x 580, 584 (6th Cir. 2007) (concluding that because the ALJ considered the claimant's coronary heart disease and diabetes when determining his residual functional capacity, it was not necessary to decide "whether the ALJ erred in classifying the impairments as non-severe at step two[.]").

The Court therefore does not find error in the ALJ's treatment of Dr. Shah's opinion to warrant reversal of the Commissioner's decision.

**B.     The ALJ's Consideration of Dr. Shaw's & Dr. Mian's Opinions**

Ross contends that the ALJ purported to give "great weight" to Dr. Shaw's and Dr. Mian's opinions but then failed to incorporate the restrictions in those opinions into the ultimate RFC assessment.  Specifically, Ross contends that the ALJ failed to incorporate Dr. Shaw's finding that she could only bend "minimally" and purported finding that she could not lift more than ten pounds of weight.  With respect to Dr. Mian, Ross seems to complain that the ALJ imposed more restrictions on her ability to work than supported by the doctor's opinion.

The ALJ did incorporate Dr. Shaw's bending restriction in the RFC, however, by limiting her to only occasional stooping.  The Social Security Regulations (SSR) define "stooping" as "bending the body downward and forward by bending the spine at the waist[.]"  SSR 83-14, 1983 WL 31245, at *7 (1985). As the regulations provide, stooping is a "progressively more strenuous form[]" of bending.  *Id*.  Contrary to Ross' contention, Dr. Shaw did not assess a ten pound lifting restriction.  Rather, Dr. Shaw opined that Ross could "lift at least ten pounds of weight without difficulty."  (Tr. 468.)  This opinion does not preclude Ross from lifting more weight.

The fact that the ALJ imposed more restrictions when assessing Ross' RFC than set forth in Dr. Mian's opinion does nothing to discount the ALJ's decision. *Carstens v. Comm'r or Soc. Sec'y*, No. 12-1335, 2013 WL 3245224, *6 (D.P.R.

24

June 26, 2013) (citing *Dampeer v. Astrue*, 826 F. Supp. 2d 1073, 1085 (N.D. Ill. 2011) (ALJ incorporating additional limitations in medical evidence to determine claimant's RFC for sedentary work, when physicians concluded he could do light work, gave claimant benefit of the doubt and arrived at an RFC supported by substantial evidence).

### C.    The ALJ's Credibility Determination

The ALJ found that Ross' medical impairments could cause her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of those symptoms were not fully credible.  (Tr. 27-28.)  Here, Ross contends that the ALJ did not provide sufficient reasons for discounting her credibility.  For example, Ross argues that the fact she "continues to avidly look for work" (Tr. 28) should have been viewed favorably by the ALJ, as it "speak[s] highly of [Ross] as a motivated individual who would work if she could."  (ECF No. 12 at Pg ID 869.)  She further contends that her enrollment in a college course which meets once a week for four hours is not contradictory of a finding that she is disabled.

The Sixth Circuit has held that determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.' "  *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir.

1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record.  *See Walters v. Comm'r of Soc. Sec'y,* 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain or other symptom is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he or she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians … and any other relevant evidence in the case record" to determine if the claimant's claims regarding the severity of her symptoms are credible.  *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529.  Such relevant evidence includes the following: the claimant's daily activities; details surrounding the claimant's pain or other symptoms; any precipitating or aggravating factors; type, dosage, effectiveness, and side effects of any medication the claimant takes; the claimant's treatment, other than medication; any measures the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. §404.1529(c)(3).  In addition, Social Security Ruling 96-7p requires the ALJ to provide a sufficiently specific explanation for his or her credibility determination so that it is clear to the individual and any subsequent reviewers the weight given to the individual's statements and the reasons for that weight.  *See Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1996).

As detailed above, after finding at Step Two that Ross has the severe impairments of degenerative joint disease of the right foot, hypertension, diabetes, diabetic neuropathy, obesity and depressive disorder, the ALJ concluded that she has the residual functional capacity to perform a reduced range of light work which avoids concentrated or excessive exposure to respiratory irritants and humidity and is limited to simple, unskilled work.  The ALJ provided sufficiently specific explanations for her credibility determination, identifying several relevant factors that undermined Ross' claims concerning the intensity, persistence, and limiting effects of her symptoms.  For example, the ALJ pointed to Ross' statements on her disability report "that she takes care of a pet, and does some household chores, such as washing dishes, cleaning the bathroom and mopping the kitchen" . . . and "could pay bills, count change, handle a saving account and use a checkbook." (Tr. 27.)  The ALJ also noted that Ross provided varying explanations for why her job with Kelly Services ended-- at first claiming that it was due to the severity of

27

her symptoms, but later indicating that the agency had lost its contract with the company with which she had been placed.  (Tr. 27-28.)

In addition to Ross' continued attempts to find a job, the ALJ found significant Ross' testimony that she can play solitaire on the computer for an hour at a time and does all her homework on the computer.  (Tr. 28.)  The ALJ found this evidence contradictory of Ross' claim that her arthritis impairs her ability to do computer work.  (*Id*.)  Ross' testimony that she uses a cane daily, even while at home, was contradicted by information provided in medical source statements that she did not use a cane and reported no need for assistive devices or accommodations.  (*Id*.)  Although diagnosing Ross with multiple symptoms, including chronic pain syndrome and fibromyalgia, Ross' treating physician found her condition stable and declined to endorse Ross' application for a handicapped parking placard.  (Tr. 29.)

In sum, contrary to Ross's argument, the ALJ properly considered factors relevant in evaluating her credibility, and that credibility determination is supported by substantial evidence.  *See* 20 C.F.R. §404.1529(c)(2),(3), and(4).

## VII.  Conclusion

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that substantial evidence supports the ALJ's decision finding Ross not disabled under the Act.

Accordingly,

**IT IS ORDERED**, that Plaintiff's Motion for Summary Judgment [ECF No. 12] is **DENIED**;

**IT IS FURTHER ORDERED**, that Defendant's Motion for Summary Judgment [ECF No. 15] is **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 18, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, March 18, 2015, by electronic and/or U.S. First Class mail.

s/ Richard Loury
Case Manager